Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GIDEON AKANDE, derivatively on behalf of XPONENTIAL FITNESS INC.,<br><br>Plaintiff,<br><br>v.<br><br>ANTHONY GEISLER, JOHN MELOUN, JAIR CLARKE, MARK GRABOWSKI, CHELSEA A. GRAYSON, and BRENDA MORRIS,<br><br>Defendants,<br><br>and<br><br>XPONENTIAL FITNESS INC.,<br><br>Nominal Defendant. | Case No.:<br><br>**DEMAND FOR JURY TRIAL**<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

## INTRODUCTION

Plaintiff Gideon Akande ("Plaintiff"), by Plaintiff's undersigned attorneys,

derivatively and on behalf of nominal defendant Xponential Fitness Inc. ("Xponential" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Anthony Geisler ("Geisler"), John Meloun ("Meloun"), Jair Clarke ("Clarke"), Mark Grabowski ("Grabowski"), Chelsea A. Grayson ("Grayson"), and Brenda Morris ("Morris") (collectively, the "Individual Defendants," and together with Xponential, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Xponential, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, violations of Section 14(a) of the Exchange Act of 1934 (the "Exchange Act"), violations of Sections 20(a) and 10(b) and Rule 10b-5 of the Exchange Act, and against Defendants Geisler and Meloun for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Xponential, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from July 26, 2021 to December 7, 2023, inclusive (the "Relevant Period").

2. Xponential claims to be the "largest franchisor of boutique fitness brands." The Company operates a series of ten fitness boutiques that range from Pilates, indoor cycling, barre, stretching, rowing, dancing, boxing, running, functional training, and yoga. By the

end of 2022, the Company boasted more than 1,700 franchisees and licenses involving more than 1,900 studios, requiring the studios to be opened under franchise agreements across the North American continent. According to Xponential's SEC filings, its portfolio brands include: (1) Club Pilates, the largest pilates brand in the U.S.; (2) CycleBar, the largest indoor cycling brand in the U.S.; (3) StretchLab, a concept providing individual and group stretching services; (4) Row House, the largest franchised indoor rowing brand in the U.S.; (5) AKT, a dance-centric cardio workout provider which combines toning, interval, and circuit training; (6) YogaSix, the largest franchised yoga brand in the U.S.; (7) Pure Barre, a total body workout using a ballet bar to perform small isometric movements, and the largest barre brand in the U.S.; (8) Stride, a treadmill-based cardio and strength training concept offering; (9) Rumble, a boxing-inspired full-body workout; and (10) Body Fit Training, a functional training and strength-based program. As of December 31, 2022, Xponential had over 1,700 franchisees and licenses for over 1,900 studios contractually obligated to be opened under existing franchise agreements in North America.

3. The Company is deeply entwined with operating its franchises. The Company created and facilitates a sophisticated selection process for choosing franchisees. After franchisees are selected, the Company provides them with the Xponential Playbook, a guide that provides franchisees significant ongoing support, with the goal of maximizing studio-level productivity and profitability, as well as maintaining consistent operations across the various studios nationwide. Indeed. franchisees are integrated into Xponential's corporate operations, allowing franchisees to leverage integrated systems and shared services. Almost all of the Company's franchisee support services are integrated into the corporate levels of Xponential, with the only other services being marketing and fitness programming, which are unique to each brand.

4. Xponential's franchise contracts have an initial ten-year term. These contracts permit the Company to terminate the agreement if a franchisee is in default, has failed to attain minimum monthly gross revenue quotas, or has failed to choose a suitable studio

location within a designated time.

5. Regarding the gross revenue quotas, the Company expects its franchisees to attain and maintain minimum monthly gross revenue quotas by the end of the first and second years of their studio opening to the public. If a franchisee fails to mee these quotas for 36 consecutive months at any point during the term of the contract, the Company is empowered to require completion of mandatory corrective training programs or end the agreement entirely. Since the Company's founding until the end of the 2022 Fiscal Year, the Company terminated approximately 600 of the Company's sold licenses in North America and 30 licenses had been terminated outside North America.

6. Xponential's revenues mostly consist of franchise licenses and franchise related equipment, merchandise sales, and franchise training revenue. Xponential also takes in on-demand revenue, service revenue, and other revenue.

7. Xponential publicly maintains that the Company does not record sales by franchisees as revenue and that such sales are not included in its consolidated financial statements filed with the SEC. In lieu of public disclosure of these important revenue figures, the Company gives investors key performance data that the Company's management, including the Individual Defendants, use to assess the Company's performance. These key performance indicators include sales by franchisees that are not recognized as revenue in the Company's financial statements. These sales are measured by same-store sales ("SSS") and average unit volume ("AUV").

8. The Company publicly maintains that SSS reflects the change in period-over-period sales for studios in the Company's North American same-store base. Importantly, SSS only includes sales from studios that have been operating for at least 13 calendar months as of the measurement date). To determine AUV, the Company divides sales during the applicable period for all studios being measured by the number of studios being measured. AUV growth is mostly affected by SSS changes and to a lesser degree, by new studio openings. Management, including the Individual Defendants, use AUV to evaluate

economics.

9. The Individual Defendants took the Company public through an initial public offering ("IPO") in July 2021, during which more than ten million Xponential shares were sold (including a partial exercise of the underwriter's overallotment option) at $12 per share. Following the IPO, the Company conducted two additional registered stock offerings, which allowed insiders Defendants Geisler and Grabowski to sell additional stock. Specifically, the Company held an April 2022 secondary stock offering at $20 per share, and a February 2023 secondary offering at $24.50 per share (the "SPOs"). Defendants Geisler and Grabowski sold roughly $270 million worth of Company stock in the SPOs and in the secondary market transactions.

10. The truth about Xponential began to emerge when short-biased analyst firm Fuzzy Panda published a research report titled "Xponential Fitness (XPOF) – 'Abusive Franchisor That Is A House Of Cards'" (the "Fuzzy Panda Report") on June 26, 2023.

11. The Fuzzy Panda Report was based on the examination of over 16,000 pages, including among 64 Franchise Disclosure Documents ("FDDs") filed with the Federal Trade Commission and various state regulators, in addition to a "multitude of interviews" and other information. The Fuzzy Panda Report claimed that the allegations contained therein "often had multiple sources tell us corroborating facts" and that the authors would "happily provide interview transcripts, contact information, and any other documentation received from those sources who have agreed we can share the information with the SEC, State Attorney Generals, government regulators, or reputable journalists."

12. The Fuzzy Panda Report revealed that, among other things, Defendant Geisler had a long history of misleading investors, including being exposed on camera for using "boiler room" tactics, referring to a scheme where a salesperson implements high-pressure sales tactics to persuade investors to purchase speculative and fraudulent securities, to mislead investors in connection with a previous venture and issuing false claims that Xponential "never closed a store." The Fuzzy Panda Report revealed that its examination

of 64 FDDs demonstrated ***8 of 10*** Xponential brands are losing money monthly and ***more than 50%*** of its studios never make a positive financial return. The Fuzzy Panda Report also stated that ***more than 100*** of Xponential's franchises were for sale at a price 75% less than their initial cost and that the Company selectively and misleadingly reported core Company performance metrics such as SSS and AUV to investors, for example, by excluding  the date from underperforming stores.

13. Following the release of the Fuzzy Panda Report, the price of Xponential common stock dropped $9.39 per share on heavy trading volume, to a close at $15.57, amounting to more than a 37% decline.

14. The truth fully emerged when Bloomberg Businessweek ("Businessweek") published an expose on Xponential that largely corroborated the allegations of the Fuzzy Panda Report, titled "Club Pilates, Pure Barre Owners Say Xponential Left Them Bankrupt," on December 7, 2023.

15. The Businessweek article stated that Businessweek had interviewed dozens of former business partners, employees, and franchisees of the Company who revealed that the Company had misguided many Xponential franchisees into a "financial nightmare." The Businessweek article also stated that Defendant Geisler "has a track record of combative management, deploying growth-at-all-costs tactics and unleashing aggressive reprisals against anyone who gets in his way." The Businessweek article also stated that these tactics forced "many of the company's franchisees… [to] have either declared bankruptcy or los[e] their retirement savings."

16. On December 11, 2023, following the release of the Businessweek article, the price of the Company's common stock fell to a close of $8.99, a more than 26% drop over two trading days on heavy trading volume.

17. During the Relevant Period, the Individual Defendants breached their fiduciary duties to the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the

Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company permanently closed at least 30 stores; (2) the Company's reported SSS and AUV data had been misstated by excluding the underperforming stores; (3) 8 out of 10 of the Company's brands were operating at a net loss monthly; (4) more than 50% of the Company's studios were unable to make a positive financial return; (5) more than 60% of the Company's revenue was one-time and not recurring; (6) over 100 of the Company's franchises were for sale at a price that was at least 75% lower than their initial cost; (7) the Company had deceived many of its franchisees into opening franchises by misrepresenting the financial profitability and profile of its studios, in addition to the anticipated rate of return for new studio openings; (8) as a result, many of the Company's franchisees were in substantial debt, experienced high attrition rates and operated non-viable studios that had no practical path to profitability; and (9) the Company lacked internal controls. As a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

18. The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing Xponential to fail to correct these false and misleading statements and omissions of material fact, while, during the Relevant Period, Defendants Geisler and Meloun both engaged in insider trading.

19. Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, the Individual Defendants caused Xponential to repurchase approximately 2,010,050 shares of the Company's stock at artificially inflated prices between August 1, 2023 and August 31, 2023 for over $38 million, and 588,827 shares between October 1, 2023 and October 31, 2023 for over $9 million. As the Company's common stock was actually worth only $8.99 per share, the price at which it was trading when the truth emerged on December 11, 2023, the

Company overpaid by approximately $26 million in total for repurchases of its own stock during the Relevant Period.

20. In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO") and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

21. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

22. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendant Geisler's and Meloun's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, their causing the Company to make the repurchases alleged herein, and their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## **JURISDICTION AND VENUE**

23. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections

10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. §240.10b-5) and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

24. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

25. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

26. Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

27. Plaintiff is a current shareholder of Xponential. Plaintiff has continuously held Xponential common stock since purchasing it on July 23, 2021.

### Nominal Defendant Xponential

28. Xponential is a Delaware corporation with principal executive offices at 17877 Von Karman Ave., Suite 100, Irvine, California, 92614. Xponential's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "XPOF."

### Defendant Geisler

29. Defendant Geisler is the Founder, CEO, and serves as a Company director of Xponential. Defendant Geisler has served as a Company director and the Company's CEO since 2017. According to the proxy statement the Company filed with the SEC on March 21, 2023 (the "2023 Proxy Statement"), as of March 1, 2023, Defendant Geisler beneficially owned approximately 1,216,375 shares of the Company's Class A common stock, representing 4% of the total Class A common stock, 7,464,033 shares of Class B common stock, representing 44% of the total Class B common stock, and a combined 8,680,408

shares altogether and 16% of the total combined voting power of the Company. Given that the price per share of the Company's common stock at the close of trading on March 1, 2023 was $25.39, Defendant Geisler owned approximately $220,395,559.12 worth of Xponential stock as of that date.

30. For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Geisler received $6,895,918 in total compensation from the Company. This included $600,000 in base salary, $6,294,303 in stock awards, and $1,615 in other compensation. For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Geisler received $17,066,039 in total compensation from the Company. This included $492,308 in base salary, $415,068 in bonuses, $15,911,118 in stock awards, and $247,545 in other compensation.

31. During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Geisler made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 02/10/2023 | 1,000,000 | $24.50 | $24,500,000 |
| 03/06/2023 | 110,445 | $30.34 | $3,350,901 |
| 03/07/2023 | 1,900 | $30.25 | $57,475 |
| 03/31/2023 | 66,200 | $30.26 | $2,003,212 |
| 04/03/2023 | 69,255 | $31.25 | $2,164,565 |
| 04/04/2023 | 38,535 | $31.04 | $1,196,126 |
| 04/06/2023 | 200 | $31.00 | $6,200 |
| 04/10/2023 | 47,717 | $31.22 | $1,489,724 |
| 04/11/2023 | 84,709 | $31.87 | $2,699,675 |
| 04/12/2023 | 300 | $32.06 | $9,618 |
| 04/17/2023 | 51,104 | $32.15 | $1,642,993 |

| | | | |
|---|---|---|---|
| 04/18/2023 | 57,100 | $32.52 | $1,856,892 |
| 04/19/2023 | 81,570 | $32.83 | $2,677,943 |
| 04/20/2023 | 5,393 | $33.17 | $1,043,296 |
| 04/28/2023 | 31,453 | $33.17 | $1,043,296 |
| 05/01/2023 | 30,785 | $33.21 | $1,022,369 |
| 05/02/2023 | 4,105 | $33.02 | $135,547 |
| 05/05/2023 | 100 | $33.49 | $3,349 |
| 05/25/2023 | 13,627 | $25.09 | $341,833 |
| 07/05/2023 | 17,703 | $16.67 | $295,144 |
| **TOTAL** | **1,712,201** | **-** | **$47,540,158** |

32. His lucrative insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

33. The 2023 Proxy Statement says the following about Defendant Geisler:

> Mr. Geisler is our founder and has served as our Chief Executive Officer and on our board of directors since 2017. Mr. Geisler began his career in fitness with the purchase of LA Boxing in 2001. He franchised the brand and built it into the largest boxing, kickboxing, and mixed martial arts fitness franchise in the country. Mr. Geisler sold the business to UFC Gym in 2012. In 2015, Mr. Geisler purchased Club Pilates, which at the time had about 30 locations. Mr. Geisler served as CEO and led the company through robust growth, roughly quadrupling the number of open studio locations, before selling a stake of the company to private equity firm TPG Growth in May 2017. Later in 2017, Mr. Geisler created Xponential Fitness, with the vision of integrating leading boutique fitness brands across all fitness verticals on one platform. In addition to Club Pilates, he has brought 9 other brands onto the platform since, creating the largest boutique fitness franchise company in the world, with over 2,600 global locations. Mr. Geisler holds a B.A. from

> University of Southern California. We believe Mr. Geisler is qualified to serve on our board of directors because he is a fitness industry veteran with more than 18 years of experience and an accomplished entrepreneur. Furthermore, Mr. Geisler has accumulated extensive perspective, operational insight and expertise as our founder and Chief Executive Officer.

**Defendant Meloun**

34. Defendant Meloun serves as CFO of Xponential. Defendant Meloun has served as CFO since July 2018. According to the 2023 Proxy Statement, as of March 1, 2023, Defendant Meloun beneficially owned approximately 70,373 shares of the Company's Class A common stock, 185,904 shares of Class B common stock, representing 1% of the total Class B common stock, and a combined 256,277 shares altogether. Given that the price per share of the Company's common stock at the close of trading on March 1, 2023 was $25.39, Defendant Meloun owned approximately $6,506,873.03 worth of Xponential stock as of that date.

35. For the 2022 Fiscal Year, Defendant Meloun received $5,073,992 in total compensation from the Company. This included $310,961 in base salary, $4,720,708 in stock awards, and $42,323 in other compensation. For the 2021 Fiscal Year, Defendant Meloun received $1,361,089 in total compensation from the Company. This included $300,000 in base salary, $150,000 in bonuses, $870,951 in stock awards, and $40,138 in other compensation.

36. During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Meloun made the following sale of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 05/25/2023 | 26,000 | $28.26 | $734,760 |
| **TOTAL** | **26,000** | - | **$734,760** |

37. His lucrative insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

38. The 2023 Proxy Statement says the following about Defendant Meloun:

> John Meloun has served as our Chief Financial Officer since July 2018. From March 2015 to July 2018, Mr. Meloun served in executive roles at The Joint Corp, a national operator, manager and franchisor of chiropractic clinics, including as Chief Financial Officer from November 2016 to July 2018, and as Director of Financial Planning and Reporting. From January 2010 to March 2015, Mr. Meloun served as a Senior Director of Financial Planning and Analysis at the University of Phoenix, where he provided guidance to the Chief Financial Officer and Vice President. Earlier in his career, Mr. Meloun served as World Wide Financial Planning & Analysis Manager at Emerson Network Power, and, prior to that, Mr. Meloun held various roles at Motorola, most recently serving as Senior Marketing and Engineering Analyst. Mr. Meloun holds both a B.S. and an M.B.A. from Arizona State University.

**Defendant Morris**

39. Defendant Morris serves as a Company director of Xponential. Defendant Morris has served as a Company director since May 2019. Defendant Morris also serves as the Chair of the Audit Committee, a member of the Human Capital Management Committee, and a member of the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of March 1, 2023, Defendant Morris beneficially owned approximately 22,243 shares of the Company's Class A common stock, 811 shares of Class B common stock, and a combined 23,054 altogether. Given that the price per share of the Company's common stock at the close of trading on March 1, 2023 was $25.39, Defendant Morris owned approximately $585,341.06 of Xponential stock.

40. For the 2022 Fiscal Year, Defendant Morris received $214,125 in total compensation. This included $129,125 in fees earned or paid in cash and $85,000 in stock

awards. For the 2021 Fiscal Year, Defendant Morris received $162,500 in total compensation. This included $87,500 in fees earned or paid in cash and $75,000 in stock awards.

41. The 2023 Proxy Statement says the following about Defendant Morris:

> Ms. Morris has served on our board of directors since May 2019. Ms. Morris has over 36 years of experience in finance, accounting and operations roles concentrated in consumer products, food and beverage, retail and wholesale sectors. Ms. Morris is currently a Partner at CSuite Financial Partners, a financial executive services firm, which she joined in November 2015. Ms. Morris currently serves on the boards of directors of Boot Barn Holdings, Inc. and Asarasi Inc, a private sparkling tree water company. From 2016 to 2019, Ms. Morris served as Chief Financial Officer at Apex Parks Group, a privately held operating company of family entertainment centers, water parks and amusement parks. From 2015 to 2016, Ms. Morris served as Senior Vice President, Finance at Hot Topic, Inc., a specialty retailer. From 2013 to 2015, Ms. Morris served as Chief Financial Officer at 5.11 Tactical, a tactical gear and apparel wholesaler and retailer. Ms. Morris holds a B.A. from Pacific Lutheran University and an M.B.A. from Seattle University.

**Defendant Grayson**

42. Defendant Grayson serves as a Company Director of Xponential. Defendant Grayson has served as a Company director since October 2021. Defendant Grayson also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of March 1, 2023, Defendant Grayson beneficially owned approximately 4,635 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2023 was $25.39, Defendant Grayson owned approximately $117,682.65 worth of Xponential stock as of that date.

43. For the 2022 Fiscal Year, Defendant Grayson received $172,125 in total compensation from the Company. This included $87,125 in fees earned or paid in cash and

$85,000 in stock awards. For the 2021 Fiscal Year, Defendant Grayson received $90,646 in total compensation from the Company. This included $15,652 in fees earned or paid in cash and $74,994 in stock awards.

44. The 2023 Proxy Statement says the following about Defendant Grayson:

> Chelsea A. Grayson has served on our board of directors since October 2021. An experienced public company CEO and board member, Ms. Grayson has over 20 years of experience in business, corporate finance, governance, M&A and law. Ms. Grayson is an Executive-in-Residence at Wunderkind (formerly BounceX), a leading marketing technologies provider; the interim CEO and a member of the Board of Directors of Spark Networks SE (NYSE: LOV); and a member of the Board of Directors of Goodness Growth Holdings (CSE: GNDS), where she also chairs the Nominating & Corporate Governance Committee and sits on the Audit Committee. She is also a member of the UCLA Board of Visitors for the English Department and a Board Leadership Fellow and Corporate Governance Fellow with the National Association of Corporate Directors (NACD). Previously, she was the Chief Executive Officer and a board member of True Religion, Inc. (where she chaired the Audit Committee); the Chief Executive Officer and a board member of American Apparel Inc; a member of the Board of Directors of iHerb, where she was the lead independent director and chaired the Nomination & Corporate Governance Committee; and the Chairperson of the Board of Directors of Lapmaster Group Holdings. Ms. Grayson also previously sat on the Boards of Directors of Sugarfina and Delta Dental. Before joining American Apparel, Ms. Grayson was a partner in the Mergers & Acquisitions practice group of law firm Jones Day. Ms. Grayson received a J.D. from Loyola Law School and a BA from the University of California, Los Angeles. We believe Ms. Grayson is qualified to serve on our board of directors based on her extensive experience in business, corporate finance and executive management and as a member of the board of directors of various companies in the consumer products and technology industries.

**Defendant Grabowski**

45. Defendant Grabowski serves as Chairman of the Board of Xponential. Defendant Grabowski has served as Chairman of the Board since May 2017. Defendant Grabowski also serves as the Chair of the Human Capital Management Committee, and the Chair of the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of March 1, 2023, Defendant Grabowski beneficially owned approximately 6,861,735 shares of the Company's Class A common stock, representing 21% of the total Class A common stock, 7,453,744 shares of Class B common stock, representing 43% of the total Class B common stock, and a combined 14,315,479 shares altogether and 27% of the total combined voting power. Given that the price per share of the Company's common stock at the close of trading on March 1, 2023 was $25.39, Defendant Grabowski owned approximately $363,470,011.81 worth of Xponential stock as of that date.

46. For the 2022 Fiscal Year, Defendant Grabowski received $234,000 in total compensation from the company. This included $149,000 in fees earned or paid in cash and $85,000 in stock awards. For the 2021 Fiscal Year, Defendant Grabowski received $373,949 in total compensation from the company. This included $54,688 in fees earned or paid in cash, $115,094 in stock awards, and $204,167 in all other compensation.

47. The 2023 Proxy Statement says the following about Defendant Grabowski:

> Mr. Grabowski has served as the Chairman of our board of directors since May 2017. Mr. Grabowski is a Managing Partner at Snapdragon Capital Partners, which he founded in 2018, where he focuses on health and wellness as a core vertical of investment. From August 2016 to June 2018, Mr. Grabowski was a partner at TPG Growth, where he oversaw the platform's consumer investments. From January 2007 to August 2016, Mr. Grabowski was a Managing Director at L Catterton, a middle market consumer-focused private equity firm. Mr. Grabowski has prior private equity experience at AEA Investors and American Capital Strategies. Mr. Grabowski holds an A.B. degree in Economics from Dartmouth College and an M.B.A. from The Wharton School of the University of Pennsylvania. We believe Mr. Grabowski is qualified to serve on our board of

> directors because of his extensive business and investment expertise and his knowledge of our company and our industry.

**Defendant Clarke**

48. Defendant Clarke serves as a Company director of Xponential. Defendant Clarke has served as a Company director since July 2022. Defendant Clarke also serves as a member of the Audit Committee and the Human Capital Committee. According to the 2023 Proxy Statement, as of March 1, 2023, Defendant Clarke did not beneficially own any shares of the Company's common stock as of that date.

49. For the 2022 Fiscal Year, Defendant Clarke received $103,272 in total compensation from the Company. This included $36,750 and $66,522 in stock awards.

50. The 2023 Proxy Statement says the following about Defendant Clarke:

> Jair Clarke has served on our board of directors since July 2022. Mr. Clarke has over 15 years of experience in technology, business and operations roles concentrated in product management, digital transformation, digital marketing, cybersecurity, data science, emerging technology, business architecture, customer experiences and worldwide innovation. Mr. Clarke is currently the Global Chief Technology Officer of Commercial Systems at Microsoft Corporation, joining the company in August 2020. Prior to Microsoft Corporation, from 2014 to 2020, Mr. Clarke served in a variety of technology and business executive positions at the Walt Disney Company. From 2007 to 2014, Mr. Clarke was an IT & Business Development Executive at IBM. From 2005 to 2007, Mr. Clarke consistently expanded his technology responsibilities at Lockheed Martin. Mr. Clarke holds a B.B.A. degree in computer information systems from the University of Miami. We believe Mr. Clarke is qualified to serve on our board of directors based on his extensive experience in the technology industry.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

51. By reason of their positions as officers, directors, and/or fiduciaries of Xponential and because of their ability to control the business and corporate affairs of Xponential, the Individual Defendants owed Xponential and its shareholders fiduciary

obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Xponential in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Xponential and its shareholders so as to benefit all shareholders equally.

52. Each director and officer of the Company owes to Xponential and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

53. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Xponential, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

54. To discharge their duties, the officers and directors of Xponential were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

55. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Xponential, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of the Company's Board at all relevant times.

56. As senior executive officers and/or directors of a publicly-traded company

whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

57. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Xponential were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Xponential's corporate governance and applicable codes of conduct and/or ethics;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Xponential conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of

the business and internal affairs of Xponential and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Xponential's operations would comply with all applicable laws and Xponential's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

58. Each of the Individual Defendants further owed to Xponential and the shareholders the duty of loyalty requiring that each favor Xponential's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

59. At all times relevant hereto, the Individual Defendants were the agents of each other and of Xponential and were at all times acting within the course and scope of such agency.

60. Because of their advisory, executive, managerial, directorial, and controlling positions with Xponential, each of the Individual Defendants had access to adverse,

nonpublic information about the Company.

61. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Xponential.

## XPONENTIAL'S CODE OF ETHICS AND CORPORATE GOVERNANCE

***The Code of Ethics***

62. The Company's Code of Business Conduct and Ethics (the "Code of Ethics") begins by stating that the "Board of Directors" "adopted" the Code of Ethics to "summarize the standards that must guide [the Company's] actions." The Code of Ethics then states the following regarding what purposes the Code of Ethics serves and who the Code of Ethics applies to:

> We must strive to foster a culture of honesty and accountability. Our commitment to the highest level of ethical conduct should be reflected in all of the Company's business activities including, but not limited to, relationships with employees, customers, suppliers, competitors, the government, the public and our shareholders. All of our employees, officers and directors must conduct themselves according to the language and spirit of this Code and seek to avoid even the appearance of improper behavior. Even well-intentioned actions that violate the law or this Code may result in negative consequences for the Company and for the individuals involved.
>
> One of our Company's most valuable assets is its reputation for integrity, professionalism and fairness. We should all recognize that our actions are the foundation of our reputation and adhering to this Code and applicable law is imperative.

63. In a section titled "Compliance with Laws, Rules and Regulations," the Code of Ethics states the following:

> We are strongly committed to conducting our business affairs with honesty and integrity and in full compliance with all applicable laws, rules and regulations. No employee, officer or director of the Company shall commit an illegal or unethical act, or instruct others to do so, for any reason.

64. In a section titled "Trading on Inside Information," the Code of Ethics states the following:

> Using non-public, Company information to trade in securities, or providing a family member, friend or any other person with a "tip," is illegal. All non-public, Company information should be considered inside information and should never be used for personal gain or to enable others to gain from trades in our stock. You are required to familiarize yourself and comply with the Company's Insider Trading Policy, copies of which are distributed to all employees, officers and directors and are available from the legal department. You should contact the legal department with any questions about your ability to buy or sell securities.

65. In a section titled "Conflicts of Interest," the Code of Ethics states the following, in relevant part:

> Employees, officers and directors are expected to act, at all times and in all ways, in the best interest of the Company while performing their job duties. This means employees, officers and directors must avoid conflicts of interest. A "conflict of interest" occurs when a directors', officers' or employees' ability to perform his or her job responsibilities or duties for the Company are impacted by personal interests or the interests of a third party.

66. In a section titled "Protection and Proper Use of Company Assets," the Code of Ethics states the following:

> Protecting Company assets against loss, theft or other misuse is the responsibility of every employee, officer and director. Loss, theft and misuse of Company assets directly impact our profitability. Any suspected loss, misuse or theft should be reported to a manager/supervisor or the legal department. The sole purpose of the Company's equipment, vehicles, supplies and technology is the conduct of our business. They may only be used for Company business consistent with Company guidelines.

67. In a section titled "Corporate Opportunities," the Code of Ethics states the following:

> Employees, officers and directors are prohibited from taking for themselves business opportunities that are discovered through the use of corporate property, information or position. No employee, officer or director may use

> corporate property, information or position for personal gain, and no employee, officer or director may compete with the Company. Competing with the Company may involve engaging in the same line of business as the Company, or any situation where the employee, officer or director takes away from the Company opportunities for sales or purchases of products, services or interests. Employees, officers and directors owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises.

68. In a section titled "Compliance with This Code and Reporting of Any Illegal or Unethical Behavior," the Code of Ethics states the following, in relevant part:

> All employees, directors and officers are expected to comply with all of the provisions of this Code. The Code will be strictly enforced and violations will be dealt with immediately, including by subjecting persons who violate its provisions to corrective and/or disciplinary action such as dismissal or removal from office. Violations of the Code that involve illegal behavior will be reported to the appropriate authorities.
>
> Situations which may involve a violation of ethics, laws, rules, regulations or this Code may not always be clear and may require the exercise of judgment or the making of difficult decisions. Employees, officers and directors should promptly report any concerns about a violation of ethics, laws, rules, regulations or this Code to their supervisors/managers and the Legal Department, or, in the case of accounting, internal accounting controls or auditing matters, the Audit Committee of the Board of Directors.
>
> Any concerns about a violation of ethics, laws, rules, regulations or this Code by any employee, directors and officers should be reported promptly to the legal department and the CFO, and the CFO shall notify the Audit Committee of any violation. Any such concerns involving the legal department or CFO should be reported to the Audit Committee. Reporting of such violations may also be done anonymously by opening a case within the global ethics and compliance management platform, Navex Global on the company's intranet. For more information regarding the procedures for reporting and handling complaints and concerns related to accounting or auditing matters and ethical violations or violations of the Company's policies, please refer to our "Whistleblower Policy."
>
> The Company encourages all employees, officers and directors to report any suspected violations promptly and intends to thoroughly investigate any good faith reports of violations. The Company will not tolerate any kind of

> retaliation for reports or complaints regarding misconduct that were made in good faith. Open communication of issues and concerns by all employees without fear of retribution or retaliation is vital to the successful implementation of this Code. All employees, officers and directors are required to cooperate in any internal investigations of misconduct and unethical behavior.
>
> The Company recognizes the need for this Code to be applied equally to everyone it covers. The legal department of the Company will have primary authority and responsibility for the enforcement of this Code, subject to the supervision of the Audit Committee, and the Company will devote the necessary resources to enable the legal department to establish such procedures as may be reasonably necessary to create a culture of accountability and facilitate compliance with the Code. Questions concerning this Code should be directed to the legal department.

69. In a section titled "Waivers and Amendments," the Code of Ethics states the following:

> Any waiver of the provisions in this Code for executive officers or directors may only be granted by the Board of Directors or a committee of the Board and will be disclosed to the Company's shareholders within four business days. Any waiver of this Code for other employees may only be granted by the Legal Department. Amendments to this Code must be approved by the Nominating and Corporate Governance Committee of the Board of Directors and amendments of the provisions in this Code will also be promptly disclosed to the Company's shareholders.

***Audit Committee Charter***

70. Xponential's Audit Committee Charter defines the responsibilities of the Company's Audit Committee. Per the Audit Committee Charter, the purpose of the Audit Committee is to "assist the Board in fulfilling its responsibilities for overseeing:"

> • The Company's accounting and financial reporting processes and internal controls, as well as the audit and integrity of the Company's financial statements.
>
> • The qualifications, independence and performance of the Company's registered public accounting firm (the "independent auditor").

> • The design and implementation of the Company's internal audit function.
>
> • The Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements).
>
> • The Company's policies with respect to risk assessment and risk management pertaining to the financial, accounting and tax matters of the Company.
>
> • The Audit Committee is also responsible for preparing the report required by Securities and Exchange Commission ("SEC") rules to be included in the Company's proxy statement for the annual meeting of stockholders, and for performing such other duties and responsibilities as are enumerated in or consistent with this charter.
>
> • Any other matters that the Audit Committee deems appropriate or is requested to include by the Board.

71. The Audit Committee Charter states, among the Audit Committee's responsibilities of supervising and evaluating the independent auditor, that the Audit Committee shall do the following, in relevant part:

> • Shall discuss with the independent auditor its responsibilities under generally accepted auditing standards.
>
> • Will oversee and, at least annually, evaluate the work of the independent auditor or any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company, which evaluation shall include a review and evaluation of the lead partner of the independent auditor as well as a confirmation and evaluation of the rotation of the audit partners on the audit engagement team as required by law. The Audit Committee shall review and approve, in consultation with the independent auditor, the annual audit plan and scope of audit activities and monitor such plan's progress.
>
> • Shall review and resolve any disagreements that arise between management and the independent auditor regarding internal controls or financial reporting.

• Shall obtain the opinion of management and the Company personnel primarily responsible for the design and implementation of the internal audit function of the independent auditor's performance.

72. The Audit Committee Charter states, among the Audit Committee's responsibilities of reviewing financial statements, that the Audit Committee "may review and discuss" the following with "management, the personnel responsible for the design and implementation of the internal audit function, and the independent auditor," in relevant part:

• The Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations", and recommend to the Board whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K.

• The results of the independent audit and the quarterly reviews of the Company's financial statements, and the independent auditor's opinion on the annual financial statements.

• Major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles.

• Analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements.

• The effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.

73. The Audit Committee Charter states, among the Audit Committee's responsibilities of drafting the Audit Committee Report, that the Audit Committee "will prepare the report of the Audit Committee that SEC rules require to be included in the Company's annual proxy statement."

74. The Audit Committee Charter states, among the Audit Committee's responsibilities of reviewing "earnings press releases and earnings guidance":

> The Audit Committee, or the chairperson of the Audit Committee, shall review, in general, earnings press releases, and review and discuss with management and the independent auditors policies with respect to earnings press releases (with particular attention to any use of "pro forma" or "adjusted" non-GAAP information), financial information and earnings guidance provided to the public, analysts and ratings agencies.

75. Regarding "Internal Controls," the Audit Committee Charter states the following:

> The Audit Committee shall review and discuss with management, the personnel responsible for the design and implementation of the internal audit function, and the independent auditor the adequacy and effectiveness of the Company's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the independent auditor, the personnel responsible for the design and implementation of the internal audit function, or management which are reasonably likely to affect the Company's ability to record, process, summarize and report financial information and any special audit steps adopted or changes required in light of any material control deficiencies, the reports and certifications regarding internal control over financial reporting and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls. The Audit Committee shall also review and discuss with management and the independent auditors, disclosure relating to the Company's internal controls, the independent auditor's report on the Company's internal control over financial reporting (if applicable) and required management certifications to be included in or attached as exhibits to the Corporation's Annual Reports on Form 10-K or Quarterly Reports on Form 10-Q, as applicable.

76. Regarding "Disclosure Controls and Procedures," the Audit Committee Charter states the following: "The Audit Committee shall review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures and the reports and certifications over disclosure controls and procedures."

77. Regarding "Legal and Regulatory Compliance," the Audit Committee Charter states that the Audit Committee may:

> • Review and discuss with management, the personnel responsible for the design and implementation of the internal audit function, and the independent auditor (i) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including the Company's Code of Business Conduct and Ethics, compliance with anti-bribery and anti-corruption laws and regulations, and compliance with export control regulations and (ii) reports regarding compliance with applicable laws, regulations and internal compliance programs.
>
> • Review and discuss with management and the independent auditor any correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or accounting policies.
>
> • Review and discuss, with a senior member of the Company's legal department and outside legal counsel, any legal and regulatory matters, including legal cases against or regulatory investigations of the Company and its subsidiaries, that may have a material impact on the financial statements or the Company's compliance procedures.

78. Regarding "Risk Assessment and Risk Management," the Audit Committee Charter states the following:

> The Audit Committee shall review and discuss with management, the personnel responsible for the design and implementation of the internal audit function, and the independent auditor the Company's major financial risk exposures and the steps management has taken to monitor and control those exposures, including the Company's guidelines and policies with respect to risk assessment and risk management pertaining to financial, accounting and tax matters. The Audit Committee may also review the Company's risk management framework and programs, as well as the framework by which management discusses the Company's risk profile and risk exposures with the Board and its committees.

79. In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise

the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report known violations of the Code of Ethics and law, all while certain of the Individual Defendants personally reaped massive profits from engaging in insider trading while the Company's common stock price was artificially inflated as a result of the Individual Defendants causing the Company to make false and misleading statements.

80. Moreover, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the Company to engage in issuing materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

81. The Company purports to be the largest global franchisor of boutique fitness brands, with a platform that offers ten brands in various fitness categories. Xponential claims that its franchisees provide accessible and personalized workout experiences taught

by experienced instructors in over 2,600 studios across 48 U.S. states, the District of Columbia, and Canada. The Company also has master franchise or international expansion agreements in an additional 14 countries.

82. According to Xponential's SEC filings, its portfolio brands include: (1) Club Pilates, the largest pilates brand in the U.S.; (2) CycleBar, the largest indoor cycling brand in the U.S.; (3) StretchLab, a concept providing individual and group stretching services; (4) Row House, the largest franchised indoor rowing brand in the U.S.; (5) AKT, a dance-centric cardio workout provider which combines toning, interval, and circuit training; (6) YogaSix, the largest franchised yoga brand in the U.S.; (7) Pure Barre, a total body workout using a ballet bar to perform small isometric movements, and the largest barre brand in the U.S.; (8) Stride, a treadmill-based cardio and strength training concept offering; (9) Rumble, a boxing-inspired full-body workout; and (10) Body Fit Training, a functional training and strength-based program. As of December 31, 2022, Xponential had over 1,700 franchisees and licenses for over 1,900 studios contractually obligated to be opened under existing franchise agreements in North America.

83. The Company is deeply entwined with operating its franchises. The Company created and facilitates a sophisticated selection process for choosing franchisees. After franchisees are selected, the Company provides them with the Xponential Playbook, a guide that provides franchisees significant ongoing support, with the goal of maximizing studio-level productivity and profitability, as well as maintaining consistent operations across the various studios nationwide. Indeed. franchisees are integrated into Xponential's corporate operations, allowing franchisees to leverage integrated systems and shared services. Almost all of the Company's franchisee support services are integrated into the corporate levels of Xponential, with the only other services being marketing and fitness programming, which are unique to each brand.

84. Xponential's franchise contracts have an initial ten-year term. These contracts permit the Company to terminate the agreement if a franchisee is in default, has failed to

attain minimum monthly gross revenue quotas, or has failed to choose a suitable studio location within a designated time.

85. Regarding the gross revenue quotas, the Company expects its franchisees to attain and maintain minimum monthly gross revenue quotas by the end of the first and second years of their studio opening to the public. If a franchisee fails to mee these quotas for 36 consecutive months at any point during the term of the contract, the Company is empowered to require completion of mandatory corrective training programs or end the agreement entirely. Since the Company's founding until the end of the 2022 Fiscal Year, the Company terminated approximately 600 of the Company's sold licenses in North America and 30 licenses had been terminated outside North America.

86. Xponential's revenues mostly consist of franchise licenses and franchise related equipment, merchandise sales, and franchise training revenue. Xponential also takes in on-demand revenue, service revenue, and other revenue.

87. Xponential publicly maintains that the Company does not record sales by franchisees as revenue and that such sales are not included in its consolidated financial statements filed with the SEC. In lieu of public disclosure of these important revenue figures, the Company gives investors key performance data that the Company's management, including the Individual Defendants, use to assess the Company's performance. These key performance indicators include sales by franchisees that are not recognized as revenue in the Company's financial statements. These sales are measured by same-store sales (SSS) and average unit volume (AUV).

88. The Company publicly maintains that SSS reflects the change in period-over-period sales for studios in the Company's North American same-store base. Importantly, SSS only includes sales from studios that have been operating for at least 13 calendar months as of the measurement date). To determine AUV, the Company divides sales during the applicable period for all studios being measured by the number of studios being measured. AUV growth is mostly affected by SSS changes and to a lesser degree, by new

studio openings. Management, including the Individual Defendants, use AUV to evaluate economics.

89. During the Relevant Period, the Individual Defendants breached their fiduciary duties to the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company permanently closed at least 30 stores; (2) the Company's reported SSS and AUV data had been misstated by excluding the underperforming stores; (3) 8 out of 10 of the Company's brands were operating at a net loss monthly; (4) more than 50% of the Company's studios were unable to make a positive financial return; (5) more than 60% of the Company's revenue was one-time and not recurring; (6) over 100 of the Company's franchises were for sale at a price that was at least 75% lower than their initial cost; (7) the Company had deceived many of its franchisees into opening franchises by misrepresenting the financial profitability and profile of its studios, in addition to the anticipated rate of return for new studio openings; (8) as a result, many of the Company's franchisees were in substantial debt, experienced high attrition rates and operated non-viable studios that had no practical path to profitability; and (9) the Company lacked internal controls. As a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

**False and Misleading Statements**

***July 2021 IPO***

90. On July 26, 2021, the Company filed a prospectus for the IPO on Form 424B4 with the SEC, which incorporated and formed part of a registration statement signed by Defendants Geisler and Meloun (the "Prospectus"). The Prospectus stated that the Company had generated long-term "AUV of $449 thousand and $283 thousand in 2019 and 2020, respectively, and $453 thousand and $257 thousand for the three months ended on March

31, 2020 and 2021, respectively." The Prospectus further stated that Xponential provided "franchisees extensive support to help maximize the performance of their studios, while leveraging [its] corporate platform to accelerate growth and enhance profitability."

***August 24, 2021 Press Release***

91. The Company issued a press release on August 4, 2021. The press release announced its financial results for the second fiscal quarter ending on June 30, 2021 (the "2021 Q2 Release"). The 2021 Q2 Release stated that Xponential had experienced year-over-year system wide SSS growth of 129% and a "[r]ecovery of nearly 90% run-rate AUVs as compared to January 31, 2020, placing the Company on track to reach pre-pandemic run-rate AUVs by early 2020."

***August 25, 2021 10-Q***

92. Xponential filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2021 ("2021 Q2 10-Q") on August 25, 2021. The 2021 Q2 10-Q was signed by Defendant Meloun and contained certifications, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") and signed by Defendants Geisler and Meloun, attesting to the accuracy of the financial statements contained in the 2021 Q2 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 2021 Q2 10-Q contained the same statements as those included in the 2021 Q2 Release.

***November 11, 2021 Press Release***

93. Xponential issued a press release on November 11, 2021, announcing its financial results for the third fiscal quarter ending on September 30, 2021 (the "2021 Q3 Release"). The 2021 Q3 Release stated that Xponential experienced year-over-year North American SSS growth of 65% and a "[n]early 90% North American run-rate average unit volume (AUV) compared to January 31, 2020."

***November 12, 2021 10-Q***

94. The Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2021 (the "2021 Q3 10-Q") on November 12, 2021. The 2021 Q3 10-Q was signed by Defendant Meloun and contained SOX certifications signed by Defendants Geisler and Meloun attesting to the accuracy of the financial statements contained in the 2021 Q3 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 2021 Q3 10-Q contained the same statements regarding the Company's alleged quarterly results as those contained in the 2021 Q3 Release.

***March 3, 2022 Press Release***

95. The Company issued a press release announcing its financial results for the fourth fiscal quarter and 2021 Fiscal Year (the "2021 FY Release") on March 3, 2022. The 2021 FY Release stated that the Company had experienced year-over-year North American SSS growth of 53% and run-rate AUV of $446,000 for the quarter, compared to the run-rate AUV of $286,000 in the prior year period.

***March 7, 2022 10-K***

96. The Company filed its annual report on Form 10-K with the SEC for the quarter and 2021 Fiscal Year on March 7, 2022 (the "2021 10-K"). The 2021 10-K was signed by Defendants Geisler, Meloun, Grabowski, Morris, and Grayson and contained SOX certifications signed by Defendants Geisler and Meloun attesting to the accuracy of the financial statements contained in the 2021 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 2021 10-K contained the same statements regarding the Company's purported quarterly results as those contained in the 2021 FY Release.

97. The 2021 10-K also stated that "[a]pproximately 77% of our revenue in 2021 and 73% of our revenue in 2020 was considered recurring, and we believe this percentage

will increase as franchise royalty fees are expected to account for a greater percentage of our revenue over time."

***March 7, 2022 Raymond James Institutional Investors Conference***

98. The Company presented at the Raymond James Institutional Investors Conference on March 7, 2022. During the course of the conference, Defendant Geisler stated, in relevant part, that:

> So affluent, engaged customers, fastest-growing segment of the $97 billion fitness industry. Through COVID, while the industry contracted by 30%, we actually grew. ***We have never permanently closed the store in the history of our business***. We actually closed about 1,500 stores temporarily for COVID, and we opened 25% more than that when we reopened.

***2022 Proxy Statement***

99. On April 5, 2022, Xponential filed a proxy statement on Schedule 14A with the SEC (the "2022 Proxy Statement"). Defendants Morris, Grayson, Grabowski, and Geisler solicited the 2022 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained false and misleading statements.

100. The 2022 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) elect one Class I Director, Defendant Morris, to serve until the 2025 annual meeting; and (2) ratify Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2022 Fiscal Year.

101. The 2022 Proxy Statement stated the following regarding the Board's role in risk oversight at the Company:

> Risk assessment and oversight are an integral part of our governance and management processes. Our Board of Directors encourages management to promote a culture that incorporates risk management into our corporate strategy and day- to-day business operations. Throughout the year, senior management reviews the risks facing us with the Board of Directors at regular Board meetings as part of management presentations that focus on particular business functions, operations or strategies, and presents the steps taken by

> management to mitigate or eliminate such risks. Our Board of Directors does not have a standing risk management committee, but rather administers this oversight function directly through the Board of Directors as a whole, as well as through various standing committees of the Board of Directors that address risks inherent in their respective areas of oversight. In particular, our Board of Directors is responsible for monitoring and assessing strategic risk exposure, including risks related to the COVID-19 pandemic, and our Audit Committee is responsible for overseeing our financial and cybersecurity risk exposures and the steps our management has taken to monitor and control these exposures.
>
> The Audit Committee also monitors compliance with legal and regulatory requirements and considers and approves or disapproves any related person transactions. Our Nominating and Corporate Governance Committee monitors the effectiveness of the Corporate Governance Guidelines. Our Compensation Committee assesses risks arising from our compensation policies and practices and whether any such risks are reasonably likely to have a material adverse effect on us. The Board does not believe that its role in the oversight of our risks affects the Board's leadership structure.

102. The 2022 Proxy Statement stated the following regarding the Company’s Code of Ethics:

> We have a written Code of Business Conduct and Ethics that applies to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer, controller, or persons performing similar functions. We have posted a current copy of the Code of Business Conduct and Ethics on our investor relations website, investor.xponential.com, in the “Governance” section under “Governance Documents.” In addition, we intend to post on our website all disclosures that are required by law or the NYSE rules concerning any amendments to, or waivers from, any provision of the Code of Business Conduct and Ethics.

103. Defendants Morris, Grayson, Grabowski, and Geisler caused the 2022 Proxy Statement to be false and misleading by failing to disclose that: (1) the Board’s, and its committees’, risk oversight functions were not being exercised as described, as evidenced by the occurrence of the wrongdoing alleged herein, which involved members of the Board; and (2) though the 2022 Proxy Statement claimed the Company’s Code of Ethics applied to

the Company's officers and directors, the Individual Defendants violated the Code of Ethics with impunity.

104. Defendants Morris, Grayson, Grabowski, and Geisler caused the 2022 Proxy Statement to be false and misleading, and failed to disclose material facts necessary to make the statement made not false and misleading, because the 2022 Proxy Statement failed to disclose, *inter alia*, that: (1) the Company permanently closed at least 30 stores; (2) the Company's reported SSS and AUV data had been misstated by excluding the underperforming stores; (3) 8 out of 10 of the Company's brands were operating at a net loss monthly; (4) more than 50% of the Company's studios were unable to make a positive financial return; (5) more than 60% of the Company's revenue was one-time and not recurring; (6) over 100 of the Company's franchises were for sale at a price that was at least 75% lower than their initial cost; (7) the Company had deceived many of its franchisees into opening franchises by misrepresenting the financial profitability and profile of its studios, in addition to the anticipated rate of return for new studio openings; (8) as a result, many of the Company's franchisees were in substantial debt, experienced high attrition rates and operated non-viable studios that had no practical path to profitability; and (9) the Company lacked internal controls.

105. As a result of Defendants Morris, Grayson, Grabowski, and Geisler causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*: (1) to re-elect Defendant Morris, even though Defendant Morris was breaching her fiduciary duties to the Company, and (2) ratify Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2022 Fiscal Year.

***May 12, 2022 Press Release***

106. The Company issued a press release on May 12, 2022, announcing its financial results for the first fiscal quarter ending on March 31, 2022 (the "2022 Q1 Release"). The 2022 Q1 Release stated that the Company experienced year-over-year North American SSS growth of 47% and run-rate AUV of $450,000 for the quarter.

***May 13, 2022 10-Q***

107. The Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2022 (the "2022 Q1 10-Q") on May 13, 2022. The 2022 Q1 10-Q was signed by Defendant Meloun and contained SOX certifications signed by Defendants Geisler and Meloun attesting to the accuracy of the financial statements contained in the 2022 Q1 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 2022 Q1 10-Q contained the same statements regarding Xponential's alleged quarterly results as those contained in the 2022 Q1 Release.

***July 27, 2022 Press Release***

108. The Company issued a press release on July 27, 2022, announcing that it expected to yield strong results for the second quarter of 2022 and that Xponential was on track to meet or exceed the 2022 full-year guidance. The press release also shared certain preliminary operating highlights for the second quarter of 2022 ending on June 30, 2022, including 25% SSS growth and run-rate AUV of $480,000.

***August 11, 2022 Press Release***

109. The Company issued a press release announcing its financial results for the quarter ended June 30, 2022 (the "2022 Q2 Release") on August 11, 2022. The 2022 Q2 Release stated that Xponential had experienced year-over-year North American SSS growth of 25% and run-rate AUV of $480,000 for the quarter.

***August 11, 2022 Earnings Conference Call***

110. That same day, on August 11, 2022, Defendants Geisler and Meloun held an earnings conference call with analysts and investors to discuss Xponential's performance for the second quarter of 2022. During the earnings conference call, Defendant Geisler boasted about the profitability of Xponential's studios and the Company's ability to continue opening more of them, stating, in relevant part:

> Importantly, ***as we continue to open more studios and as AUVs continue to grow, our profitability increases***, driven by high-margin royalties from

> growing system-wide sales with an active pipeline of approximately 2,800 studios contractually obligated to open globally and only about 3/4 of our conservative North American total addressable market currently penetrated.

***Studio openings are not expected to slow anytime soon , continuing to drive profitability.***

***August 12, 2022 10-Q***

111. The Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended on June 30, 2022 (the "2022 Q2 10-Q") on August 12, 2022. The 2022 Q2 10-Q was signed by Defendant Meloun and contained SOX certifications signed by Defendants Geisler and Meloun attesting to the accuracy of the financial statements contained in the 2022 Q2 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 2022 Q2 10-Q contained the same statements regarding the Company's alleged quarterly results as those contained in the 2022 Q2 Release.

***November 10, 2022 Press Release***

112. The Company issued a press release announcing its financial results for the fiscal quarter ended September 30, 2022 (the "2022 Q3 Release") on November 10, 2022. The 2022 Q3 Release stated that the Company experienced year-over-year North American SSS growth of 17% and run-rate AUV of $489,000 for the third quarter of 2022.

***November 10, 2022 Earnings Conference Call***

113. That same day, on November 11, 2022, Defendants Geisler and Meloun held an earnings conference call with analysts and investors to discuss Xponential's third quarter of 2022 performance. During the call, Defendant Meloun noted Xponential's alleged AUV and asserted that AUV could rise into the "high 600s," stating, in relevant part:

> AUVs will continue to increase over time. I do think long term or even in the short term, you'll see elevated same store sales throughout 2023, probably getting back to that mid to high single digits at the end of next year.
>
> With that, obviously, AUVs will continue to climb. What is that ceiling at which you kind of – it's kind of like a car, right, and they can only go so fast

> because at some point, they're pushing through air and it's harder to move faster and faster. ***But I think our AUVs, we don't know where that's at yet. Is it possible that we do see getting to the high 600s? I do think that's definitely a possibility having the entire system pushing close to 600,000 AUV. We're at $500,000 roughly now, and we're definitely not slowing down from a growth perspective.***

***November 10, 2022 10-Q***

114. The Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2022 (the "2022 Q3 10-Q") on November 10, 2022. The 2022 Q3 10-Q was signed by Defendant Meloun and contained SOX certifications signed by Defendants Geisler and Meloun attesting to the accuracy of the financial statements contained in the 2022 Q3 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 2022 Q3 10-Q also contained the same statements regarding the Company's alleged quarterly results as those contained in the 2022 Q3 Release.

***March 2, 2023 Press Release***

115. The Company issued a press release announcing its financial results for the third quarter and 2022 Fiscal Year (the "2022 FY Release"). The 2022 FY Release claimed that Xponential experienced year-over-year North American SSS growth of 17% and a run-rate AUV of $522,000 for the fourth quarter of 2021.

***March 2, 2023 Earnings Conference Call***

116. That same day, on March 2, 2023, Defendants Geisler and Meloun held an earnings conference call with analysts and investors to discuss Xponential's performance for the fourth quarter of 2021 and 2022 Fiscal Year. During the course of the earnings conference call, Defendant Meloun claimed that Xponential's large AUV growth in 2022 continued into 2023, stating, in relevant part:

> ***We had a really strong AUV growth in 2022. The momentum so far into 2023 is very promising. So for us, the more studios we get open, the more our installed base continues to exceed***

> ***expectations, 20%, 22%, 25% same-store sales, high teens in Q-4. So far in Q-1, we're seeing that carry into the year.***

***March 6, 2023 10-K***

117. The Company filed its annual report on Form 10-K with the SEC for the 2022 Fiscal Year (the "2022 10-K") on March 6, 2023. The 2022 10-K was signed by Defendants Geisler, Meloun, Grabowski, Morris, Grayson, and Clarke and contained SOX certifications signed by Defendants Geisler and Meloun attesting to the accuracy of the financial statements contained in the 2022 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

118. The 2022 10-K contained the same statements regarding Xponential's alleged quarterly results as those contained in the 2022 FY Release. The 2022 10-K also stated that, "[a]pproximately 71% of our revenue in 2022 and 77% of our revenue in 2021 was considered recurring, and we believe this percentage will increase as franchise royalty fees are expected to account for a greater percentage of our revenue over time."

***2023 Proxy Statement***

119. On March 31, 2023, Xponential filed the 2023 Proxy Statement with the SEC. Defendants Morris, Grayson, Clarke, Grabowski, and Geisler solicited the 2023 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained false and misleading statements.

120. The 2023 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) elect two Class II Directors, Defendants Grayson and Clarke, to serve until the 2026 annual meeting; and (2) ratify Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year.

121. The 2023 Proxy Statement stated the following regarding the Board's role in risk oversight at the Company:

> Risk assessment and oversight are an integral part of our governance and management processes. Our Board of Directors encourages management to promote a culture that incorporates risk management into our corporate strategy and day-to-day business operations. Throughout the year, senior management reviews the risks facing us with the Board of Directors at regular Board meetings as part of management presentations that focus on particular business functions, operations or strategies, and presents the steps taken by management to mitigate or eliminate such risks.
>
> Our Board of Directors does not have a standing risk management committee, but rather administers this oversight function directly through the Board of Directors as a whole, as well as through various standing committees of the Board of Directors that address risks inherent in their respective areas of oversight. In particular, our Board of Directors is responsible for monitoring and assessing strategic risk exposure and our Audit Committee is responsible for overseeing our financial and cybersecurity risk exposures and the steps our management has taken to monitor and control these exposures.
>
> The Audit Committee also monitors compliance with legal and regulatory requirements and considers and approves or disapproves any related person transactions. Our Nominating and Corporate Governance Committee monitors the effectiveness of the Corporate Governance Guidelines. Our Compensation Committee assesses risks arising from our compensation policies and practices and whether any such risks are reasonably likely to have a material adverse effect on us. The Board does not believe that its role in the oversight of our risks affects the Board's leadership structure.

122. The 2023 Proxy Statement stated the following regarding the Company's Code of Ethics:

> We have a written Code of Business Conduct and Ethics that applies to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer, controller, or persons performing similar functions. We have posted a current copy of the Code of Business Conduct and Ethics on our investor relations website, *investor.xponential.com*, in the "Governance" section under "Governance Documents." In addition, we intend to post on our website all disclosures that are required by law or the NYSE rules concerning any amendments to, or waivers from, any provision of the Code of Business Conduct and Ethics.

123. Defendants Morris, Grayson, Grabowski, Clarke, and Geisler caused the 2023 Proxy Statement to be false and misleading by failing to disclose that: (1) the Board's, and its committees', risk oversight functions were not being exercised as described, as evidenced by the occurrence of the wrongdoing alleged herein, which involved members of the Board; and (2) though the 2023 Proxy Statement claimed the Company's Code of Ethics applied to the Company's officers and directors, the Individual Defendants violated the Code of Ethics with impunity.

124. Defendants Morris, Grayson, Grabowski, and Geisler caused the 2023 Proxy Statement to be false and misleading, and failed to disclose material facts necessary to make the statement made not false and misleading, because the 2023 Proxy Statement failed to disclose, *inter alia*, that: (1) the Company permanently closed at least 30 stores; (2) the Company's reported SSS and AUV data had been misstated by excluding the underperforming stores; (3) 8 out of 10 of the Company's brands were operating at a net loss monthly; (4) more than 50% of the Company's studios were unable to make a positive financial return; (5) more than 60% of the Company's revenue was one-time and not recurring; (6) over 100 of the Company's franchises were for sale at a price that was at least 75% lower than their initial cost; (7) the Company had deceived many of its franchisees into opening franchises by misrepresenting the financial profitability and profile of its studios, in addition to the anticipated rate of return for new studio openings; (8) as a result, many of the Company's franchisees were in substantial debt, experienced high attrition rates and operated non-viable studios that had no practical path to profitability; and (9) the Company lacked internal controls.

***May 4, 2023 Press Release***

125. The Company issued a press release announcing its financial results for the first quarter of 2023, ended March 31, 2023 (the "2023 Q1 Release") on May 4, 2023. The 2023 Q1 Release stated that Xponential experienced year-over-year North American SSS growth of 20% and run-rate AUV of $542,000 for the first quarter of 2023.

***May 4, 2023 Earnings Conference Call***

126. That same day, on May 4, 2023, the Company held an earnings conference call with analysts and investors to discuss Xponential's performance for the first quarter of 2023. During the course of the earnings conference call, Defendant Geisler noted Xponential's alleged robust AUV and SSS growth, stating, in relevant part:

> We believe that AUV growth is the most direct measure of the health of our franchise system, and ***I am pleased to report the momentum in AUV growth has continued to build in the second quarter. We also saw same-store sales growth of 20% in the first quarter, up from 17% in the previous two quarters***.

***May 5, 2023 10-Q***

127. The Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2023 (the "2023 Q1 10-Q") on May 5, 2023. The 2023 Q1 10-Q was signed by Defendant Meloun and contained SOX certifications signed by Defendants Geisler and Meloun attesting to the accuracy of the financial statements contained in the 2023 Q1 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 2023 Q1 10-Q contained the same statements regarding the Company's alleged quarterly results as those contained in the 2023 Q1 Release.

128. The statements in ¶¶ 90-98, 106-118, and 125-127 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose, *inter alia*, that: (1) the Company permanently closed at least 30 stores; (2) the Company's reported SSS and AUV data had been misstated by excluding the underperforming stores; (3) 8 out of 10 of the Company's brands were operating at a net loss monthly; (4) more than 50% of the Company's studios were unable to make a positive financial return; (5) more than 60% of the Company's revenue was one-time and not recurring; (6) over 100 of the Company's franchises were for sale at a price that was at least 75% lower than their initial cost; (7) the

Company had deceived many of its franchisees into opening franchises by misrepresenting the financial profitability and profile of its studios, in addition to the anticipated rate of return for new studio openings; (8) as a result, many of the Company's franchisees were in substantial debt, experienced high attrition rates and operated non-viable studios that had no practical path to profitability; and (9) the Company lacked internal controls. As a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

## **The Truth Emerges**

129. The truth began to emerge on June 26, 2023, when Fuzzy Panda released the Fuzzy Panda Report. The Fuzzy Panda Report revealed, among other things, that: (1) Defendant Geisler had a long history of misleading investors; (2) the Company issued several misleading statements about the closure of its stores and the overall financial well-being of its franchisees; (3) over half of Xponential's stores were unable to ever make a positive financial return; (4) over 100 of Xponential's franchises were for sale at a price that was at least 75% lower than their initial cost; (5) 8 out of 10 of the Company's brands were operating at a net loss monthly; (6) Xponential's publicly reported SSS and AUV data exclude underperforming stores' data misleadingly; (7) more than 60% of the Company's revenue is one-time and not recurring; and (8) at least 30 of the Company's stores had permanently closed.

130. Following the release of the Fuzzy Panda Report, on June 27, 2023, the price of the Company's common stock fell $9.39 per share on heavy trading volume of over 12 million shares traded, to a close at $15.72 per share, amounting to a 37% decline.

131. The Company responded to the Fuzzy Panda Report on June 28, 2023. However, Xponential's response, while attempting to refute the Fuzzy Panda Report's allegations, did not directly address certain allegations in the Fuzzy Panda Report. Notably, Xponential's response did not address the fact that eight of ten of Xponential's brands were

losing money, nor did it address the fact that thirty stores had permanently closed. In discussing Xponential's calculation of SSS and AUV, the Company's response stated, in relevant part:

> AUV Calculation: Quarterly Run-rate AUV consists of average quarterly sales for all studios that are at least six months old at the beginning of the respective quarter, multiplied by four. Studios with zero sales in the period have always been excluded from the calculation. Inclusion of these studios would not result in a material difference. For Q1 2023, recalculating Xponential's systemwide AUV to include these studios would result in a 0.9% change to the AUV figure ($542,000 vs. $538,000).
>
> SSS Calculation: Studios are not included in the SSS calculations unless they have 13 months of continuous sales. This is a common method for calculating same store sales and is disclosed in Xponential's audited SEC filings. The Q1 2023 data set of almost 2,000 studios open continuously for 13 months or longer as of March 31, 2023 yielded robust Q1 2023 same store sales of 20%.

132. A Piper Sandler report issued in support of the Company summarized that: "Any studio that generates zero sales for even just one month is removed until 13 consecutive months of sales are generated again." Despite the fact that this report sought to downplay the impact of the accounting strategy on the Company's overall financial performance, the reports confirmed the key allegations of the Fuzzy Panda Report: Xponential excludes studios that have no sales in any given month, even if the lack of sales is the result of underperformance.

133. The price of the Company's common stock remained substantially lower than the price of the stock prior to the release of the Fuzzy Panda Report, even after the market had time to adjust for the Company's response. This indicated that the market believed the Fuzzy Panda Report to be credible and Xponential's response to be insufficient in effectively rebutting the report's allegations. Morgan Stanley, a buy-side analyst who is generally supportive of the Company, stated that the "issues raised around economics/studio performance are likely to remain a focus for investors and would benefit from better disclosures."

134. The truth fully emerged on December 7, 2023, when Businessweek published an exposé on Xponential that supported the Fuzzy Panda Report's claims, titled "Club Pilates, Pure Barre Owners Say Xponential Left Them Bankrupt." According to the article, Businessweek interviewed dozens of former business partners, employees, and franchisees of Xponential who revealed that Xponential misguided many franchisees into a "financial nightmare." The article revealed that Defendant Geisler "has a track record for combative management, deploying growth-at-all-costs tactics and unleashing aggressive reprisals against anyone who gets in his way." The article also revealed that these aggressive tactics forced "many of the franchisees… [to] have either declared bankruptcy or los[e] their retirement savings" and described in detail the various ways in which Xponential hid the true financial wellbeing of its studios and induced franchisees to open new studios based on false and misleading data regarding the Company's fiscal health and potential profitability.

135. Following the release of the Businessweek article, the price of the Company's common stock fell to a close of $8.99 per share on December 11, 2023 after two trading days on heavy trading volume, amounting to a more than 26% decline.

## REPURCHASES DURING THE RELEVANT PERIOD

136. During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $49.9 million to repurchase approximately 2.5 million shares of its own common stock at artificially inflated prices in August 2023 and October 2023.

137. According to the quarterly report on Form 10-Q the Company filed on November 8, 2023, for the period ended August 31, 2023, between August 1, 2023, and August 31, 2023, the Company purchased 2,010,050 shares of its own common stock at an average price per share of approximately $19.90, for a total cost to the Company of approximately $39,999,995.

138. As the Company's stock was actually worth only $8.99 per share, the price at closing on December 11, 2023, the Company overpaid by approximately $21,929,645 for repurchases of its own stock between August 1, 2023, and August 31, 2023.

139. According to the annual report on Form 10-K the Company filed on March 4, 2024, for the period ended on October 31, 2023, between October 1, 2023, and October 31, 2023, the Company purchased 588,827 of its own common stock at an average price per share of approximately $16.98, for a total cost to the Company of approximately $9,998,282.46.

140. As the Company's stock was actually worth only $8.99 per share, the price at closing on December 11, 2023, the Company overpaid by approximately $4,704,727 for repurchases of its own stock between October 1, 2023, and October 31, 2023.

141. Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $26 million.

## DAMAGES TO XPONENTIAL

142. As a direct and proximate result of the Individual Defendants' conduct, Xponential will lose and expend many millions of dollars.

143. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

144. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgements associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

145. Such expenditures also include, but are not limited to, amounts paid to outside lawyers, accountants, and investigators in connection thereto, and losses of revenues caused by customers' loss of trust in the Company's business and products.

146. Such losses include the Company's overpayment of nearly $26 million for repurchases of its own stock during the relevant period when the Company's stock price was artificially inflated due to Defendant's false and misleading statements discussed above.

147. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

148. As a direct and proximate result of the Individual Defendants' conduct, Xponential has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

149. Plaintiff brings this action derivatively and for the benefit of Xponential to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Xponential, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, violations of Section 14(a) of the Exchange Act, violations of Sections 20(a) and 10(b) and Rule 10b-5 of the Exchange Act, and against Defendants Geisler and Meloun for contribution under Sections 10(b) and 21D of the Exchange Act..

150. Xponential is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

151. Plaintiff is, and has been at all relevant times, a shareholder of Xponential. Plaintiff will adequately and fairly represent the interests of Xponential in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

152. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

153. A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Xponential's Board consisted of the following five individuals: Defendants Geisler, Morris, Grayson, Grabowski, and Clarke (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to three of the five Director-Defendants that were on the Board at the time this action was filed.

154. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, while they caused the Company to overpay nearly $26 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to Defendants' false and misleading statements. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

155. Moreover, each of the Director-Defendants solicited the 2023 Proxy Statement and Defendants Morris, Grayson, Grabowski, and Geisler solicited the 2022 Proxy Statement. Both the 2023 and the 2022 Proxy Statements were false and misleading in violation of Section 14(a) of the Exchange Act. Therefore, demand upon them is futile and further excused.

156. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Xponential to make the materially false and misleading statements alleged herein. Specifically, the Director-Defendants knowingly or recklessly made material misrepresentations and/or omissions for the purpose and effect of concealing Xponential's financial well-being and prospects from the investing public and supporting the artificially inflated price of Xponential's securities. As a result of the

foregoing, demand would be futile, and thus excused, as to all of the Director-Defendants, since they all breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested.

157. Additional reasons that demand as to Defendant Geisler is futile follow. Defendant Geisler is Xponential's founder, CEO, a Company director, and retains 16% of total voting power of the Company. The Company provides Defendant Geisler with significant compensation for his positions at the Company as detailed above. As CEO, Defendant Geisler was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including the 2021 10-K and the 2022 10-K, which he personally signed. Moreover, Defendant Geisler solicited the 2022 and 2023 Proxy Statements, both of which contained material misrepresentations and omissions and contributed to the re-election of Defendants Morris, Grayson, and Clarke, allowing them to continue breaching their fiduciary duties to the Company. As the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Geisler also engaged in insider trading, selling over a million shares of artificially inflated Company common stock for personal profits in excess of $47.5 million. Furthermore, Defendant Geisler is a defendant in the Securities Class Action. As a result, Defendant Geisler breached his fiduciary duties, faced a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Geisler is futile and excused.

158. Additional reasons that demand as to Defendant Morris is futile follow. Defendant Morris has served as a Company director since May 2019. The Company provides Defendant Morris with significant compensation for her role at the Company as detailed above. Defendant Morris is responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including the 2021

10-K and the 2022 10-K, which she personally signed. Moreover, Defendant Morris solicited the 2022 and 2023 Proxy Statements, both of which contained material misrepresentations and omissions and contributed to her re-election and the re-election of Defendants Grayson and Clarke, allowing her and Defendants Grayson and Clarke to continue breaching their fiduciary duties to the Company. As a trusted Company director, Defendant Morris conducted little, if any, oversight of the scheme to cause Xponential to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a result, Defendant Morris breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Morris is futile and excused.

159. Additional reasons that demand as to Defendant Grayson is futile follow. Defendant Grayson has served as Company director since June 2020. The Company provides Defendant Grayson with significant compensation for her role at the Company as detailed above. Defendant Grayson is responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including the 2021 10-K and the 2022 10-K, which she personally signed. Moreover, Defendant Grayson solicited the 2022 and 2023 Proxy Statements, both of which contained material misrepresentations and omissions and contributed to her re-election and the re-election of Defendants Morris and Clarke, allowing her and Defendants Morris and Clarke to continue breaching their fiduciary duties to the Company. As a trusted Company director, Defendant Grayson conducted little, if any, oversight of the scheme to cause Xponential to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a result, Defendant Grayson breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Grayson is futile and excused.

160. Additional reasons that demand as to Defendant Grabowski is futile follow. Defendant Grabowski has served as Chairman of the Board of Directors since May 2017 and retains 27% of the total voting power. The Company provides Defendant Grabowski with significant compensation for his role at the Company as detailed above. Defendant Grabowski is responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including the 2021 10-K and the 2022 10-K, which he personally signed. Moreover, Defendant Grabowski solicited the 2022 and 2023 Proxy Statements, both of which contained material misrepresentations and omissions and contributed to the re-election of Defendants Morris, Grayson, and Clarke, allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, Defendant Grabowski conducted little, if any, oversight of the scheme to cause Xponential to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Grabowski breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Grabowski is futile and excused.

161. Additional reasons that demand as to Defendant Clarke is futile follow. Defendant Clarke has served as Company director since July 2022. The Company provides Defendant Clarke with significant compensation for his role at the Company as detailed above. Defendant Clarke is responsible for many of the false and misleading statements and omissions that were made during the Relevant Period, including the 2022 10-K, which he personally signed. Moreover, Defendant Clarke solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to his re-election and the re-election of Defendant Grayson, allowing him and Defendant Grayson to continue breaching their fiduciary duties to the Company. As a trusted Company director, Defendant Clarke conducted little, if any, oversight of the scheme to cause Xponential to make false and misleading statements, consciously disregarded his duties to monitor such controls over

reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a result, Defendant Clarke breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Clarke is futile and excused.

162. Additional reasons that demand on the Board is futile follow.

163. Defendants Morris, Grayson, and Clarke served as members of Xponential's Audit Committee during the Relevant Period. The Audit Committee Defendants violated the Audit Committee Charter by failing to adequately review and discuss Xponential's Forms 10-K and Forms 10-Q; failing to adequately exercise their risk management and risk assessment functions; and failing to ensure adequate Board oversight of Xponential's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties and are not disinterested. Therefore, demand is excused and futile as to the Audit Committee Defendants.

164. In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

165. Xponential has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any

lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Xponential any part of the damages Xponential suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

166. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

167. The acts complained of herein constitute violations of fiduciary duties owed by Xponential's officers and directors, and these acts are incapable of ratification.

168. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Xponential. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Xponential, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

169. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Xponential to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

170. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

171. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

172. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

173. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

174. Under the direction and watch of Defendants Geisler, Meloun, Clarke, Grabowski, Morris, and Grayson, the 2022 and 2023 Proxy Statements failed to disclose that: (1) the Company permanently closed at least 30 stores; (2) the Company's reported

SSS and AUV data had been misstated by excluding the underperforming stores; (3) 8 out of 10 of the Company's brands were operating at a net loss monthly; (4) more than 50% of the Company's studios were unable to make a positive financial return; (5) more than 60% of the Company's revenue was one-time and not recurring; (6) over 100 of the Company's franchises were for sale at a price that was at least 75% lower than their initial cost; (7) the Company had deceived many of its franchisees into opening franchises by misrepresenting the financial profitability and profile of its studios, in addition to the anticipated rate of return for new studio openings; (8) as a result, many of the Company's franchisees were in substantial debt, experienced high attrition rates and operated non-viable studios that had no practical path to profitability; and (9) the Company lacked internal controls.

175. Under the direction and watch of Defendants Geisler, Meloun, Clarke, Grabowski, Morris, and Grayson, the 2022 and 2023 Proxy Statements also failed to disclose, *inter alia*, that: (1) contrary to the 2022 and 2023 Proxy Statements' descriptions of the Board's and it committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements; and (2) the Individual Defendants were violating the Code of Ethics without obtaining waivers or else without such waivers being disclosed.

176. In the exercise of reasonable care, Defendants Geisler, Meloun, Grabowski, Morris, and Grayson knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including but not limited to, the re-election of Defendant Morris as a director and the ratification of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2022 Fiscal Year.

177. In the exercise of reasonable care, Defendants Geisler, Meloun, Clarke, Grabowski, Morris, and Grayson knew or should have known that by misrepresenting or

failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to, the re-election of Defendants Grayson and Clarke as directors and the ratification of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year.

178. The false and misleading elements of the 2022 Proxy Statement led Company shareholders to, *inter alia,* (1) re-elect Defendant Morris to the Board, allowing her to continue to breach her fiduciary duties to the Company; and (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2022 Fiscal Year.

179. The false and misleading elements of the 2023 Proxy Statement led Company shareholders to, *inter alia,* (1) re-elect Defendants Grayson and Clarke to the Board, allowing them to continue to breach their fiduciary duties to the Company; and (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year.

180. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2022 and 2023 Proxy Statements.

181. Plaintiff, on behalf of Xponential, has no adequate remedy at law.

## SECOND CLAIM
**Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934**

182. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

183. Individual Defendants, by virtue of their positions with Xponential and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Xponential and each of its officers and directors who made the false and misleading

statements alleged herein within the meaning of §20(A) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Xponential to engage in the illegal conduct and practices complained herein.

184. Plaintiff, on behalf of Xponential, has no adequate remedy at law.

## THIRD CLAIM

## Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act

185. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

186. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Xponential. Not only is Xponential now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Xponential by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially inflated prices, damaging Xponential.

187. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in the earnings calls, and periodic and current reports filed with the SEC.

188. Individual defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements about Xponential not misleading.

189. The Individual Defendants, as top executives and directors of the Company, as

liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Xponential.

190. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

191. By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

192. Plaintiff, on behalf of Xponential, has no adequate remedy at law.

## FOURTH CLAIM

## Against the Individual Defendants for Breach of Fiduciary Duties

193. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

194. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Xponential's business and affairs.

195. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

196. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their

fiduciary duties to protect the rights and interests of Xponential.

197. In breach of their fiduciary duties owed to Xponential, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company permanently closed at least 30 stores; (2) the Company's reported SSS and AUV data had been misstated by excluding the underperforming stores; (3) 8 out of 10 of the Company's brands were operating at a net loss monthly; (4) more than 50% of the Company's studios were unable to make a positive financial return; (5) more than 60% of the Company's revenue was one-time and not recurring; (6) over 100 of the Company's franchises were for sale at a price that was at least 75% lower than their initial cost; (7) the Company had deceived many of its franchisees into opening franchises by misrepresenting the financial profitability and profile of its studios, in addition to the anticipated rate of return for new studio openings; (8) as a result, many of the Company's franchisees were in substantial debt, experienced high attrition rates and operated non-viable studios that had no practical path to profitability; and (9) the Company lacked internal controls. As a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

198. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

199. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls, while two of the Individual Defendants profited from improper lucrative insider sales.

200. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the

Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Xponential's securities, and disguising insider transactions.

201. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Xponential's securities and engaging in insider transactions. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

202. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

203. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Xponential has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

204. Plaintiff, on behalf of Xponential, has no adequate remedy at law.

## FIFTH CLAIM
## Against Individual Defendants for Unjust Enrichment

205. Plaintiff incorporates by reference and realleges each and every allegation set

forth above, as though fully set forth herein.

206. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Xponential.

207. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Xponential that was tied to the performance or artificially inflated valuation of Xponential, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

208. Plaintiff, as a shareholder and a representative of Xponential, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

209. Plaintiff, on behalf of Xponential, has no adequate remedy at law.

## SIXTH CLAIM
## Against Individual Defendants for Abuse of Control

210. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

211. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Xponential, for which they are legally responsible.

212. As a direct and proximate result of the Individual Defendants' abuse of control, Xponential has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

213. Plaintiff, on behalf of Xponential, has no adequate remedy at law.

## SEVENTH CLAIM

**Against Individual Defendants for Gross Mismanagement**

214. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

215. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Xponential in a manner consistent with the operations of a publicly held corporation.

216. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Xponential has sustained and will continue to sustain significant damages.

217. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

218. Plaintiff, on behalf of Xponential, has no adequate remedy at law.

## EIGHTH CLAIM

**Against Individual Defendants for Waste of Corporate Assets**

219. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

220. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

221. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Xponential to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

222. In addition, the Individual Defendants caused the Company to repurchase

shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

223. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

224. Plaintiff, on behalf of Xponential, has no adequate remedy at law.

## NINTH CLAIM

### Against Defendants Geisler and Meloun for Contribution Under Sections 10(b) and 21D of the Exchange Act

225. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

226. Xponential and Defendants Geisler and Meloun are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Geisler and Meloun's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

227. Defendants Geisler and Meloun, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

228. Accordingly, Defendants Geisler and Meloun are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

229. As such, Xponential is entitled to receive all appropriate contribution or indemnification from Defendants Geisler and Meloun.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Xponential, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Xponential;

(c) Determining and awarding to Xponential the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Xponential and the Individual Defendants to take all necessary actions to reform and improve Xponential's corporate governance and internal procedures to comply with applicable laws and to protect Xponential and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Xponential to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding Xponential restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: March 10, 2024

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/Robert C. Moest*
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

# VERIFICATION

I, Gideon Akande, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 8 day of March, 2024.

DocuSigned by:
Gideon Akande
F170D0F3BFDD469...

Gideon Akande